**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

ZENITH DATA SYSTEMS CORPORATION,
Plaintiff-Appellee,

v.

No. 96-2811

ELECTRONIC DATA SYSTEMS
CORPORATION,
Defendant-Appellant.

ZENITH DATA SYSTEMS CORPORATION,
Plaintiff-Appellee,

v.

No. 97-1258

ELECTRONIC DATA SYSTEMS
CORPORATION,
Defendant-Appellant.

Appeals from the United States District Court
for the Eastern District of Virginia at Alexandria.
Claude M. Hilton, District Judge.
(CA-96-14-A)

Argued: June 6, 1997

Decided: December 8, 1997

Before WILKINSON, Chief Judge, MICHAEL, Circuit Judge,
and MICHAEL, Senior United States District Judge for the
Western District of Virginia, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** David Samuel Cohen, COHEN & WHITE, Washington, D.C., for Appellant. Laura Kantrowitz Kennedy, SEYFARTH, SHAW, FAIRWEATHER & GERALDSON, Washington, D.C., for Appellee. **ON BRIEF:** Russell James Gaspar, COHEN & WHITE, Washington, D.C., for Appellant. Daniel Marino, Kelley P. Doran, SEYFARTH, SHAW, FAIRWEATHER & GERALDSON, Washington, D.C.; Stewart C. Economou, ECONOMOU, FORRESTER & RAY, Alexandria, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

I. <u>FACTUAL BACKGROUND</u>

In 1991, Plaintiff-Appellee Zenith Data Systems Corp. ("Zenith" or "ZDS"), Defendant-Appellant Electronic Data Systems Corp. ("EDS"), and other corporations competed against one another for the lucrative "Desktop IV" contract to supply computer hardware and software to the United States Air Force. In 1993, the Air Force awarded the contract to Zenith. EDS instituted a protest with the General Services Administration Board of Contract Appeals ("GSBCA"). Only a few days before the GSBCA was to issue a decision on the protest (April 19, 1993), EDS contacted Zenith to discuss the possibility of settling the dispute (on April 15, 1993).

By April 18, 1993, on the eve of the anticipated GSBCA decision, the parties had reached a settlement agreement memorialized in a document of the same title (hereinafter, "Settlement Agreement"); Dr. Joel Lipkin was the principal negotiator for Zenith, and Mr. Kim Luke occupied the same post for EDS. Pursuant to the Settlement

2

Agreement, EDS withdrew its GSBCA protest, and Zenith agreed to give to EDS the applications software portion of the Air Force contract. By accepting this "carved out" portion of the contract, EDS agreed to provide ZDS certain software upgrades free of charge and to "stand in the shoes" of Zenith with respect to the software component of the Desktop IV contract as if the contract had been awarded to EDS directly.

The parties' arrangement proceeded relatively smoothly for some time, until 1995, when the Air Force took the position that a Microsoft Corporation ("Microsoft") 32-bit software program--known as Office 95--was an upgrade to be provided under the Desktop IV contract at no additional cost to the Air Force. Zenith insisted that EDS was bound contractually under the Settlement Agreement to deliver these upgrades and incur the associated costs. EDS countered that the Settlement Agreement, incorporating a collateral letter to EDS from Microsoft, exempted these specific applications from its general duty to supply software upgrades gratis.

To avoid defaulting on a government contract, Zenith supplied the Air Force with the Office 95 upgrades; subsequently it brought suit against EDS, demanding declaratory judgment and damages for EDS's alleged breach of the Settlement Agreement. EDS counterclaimed, asserting, inter alia, that Zenith had breached its duty of good faith and fair dealing imposed under Virginia law by refusing to propose cost-saving modifications to the parties' contract with the Air Force.

Zenith moved the court for partial summary judgment pursuant to Fed. R. Civ. P. 56 on EDS's counterclaim's count alleging breach of good faith and fair dealing (COUNT II). The district court (Ellis, J.) granted Zenith's motion for partial summary judgment. From this ruling, EDS appeals.

Zenith's claim of contract breach was resolved by the district court (Hilton, J.) after a bench trial. The district court awarded Zenith declaratory relief and damages for breach of contract, holding that, first, the Settlement Agreement unambiguously imposed a duty on EDS to deliver the upgrades at issue to Zenith, at EDS's sole cost; second, even if, arguendo, the Settlement Agreement were ambigu-

3

ous, extrinsic evidence supports Zenith's interpretation of the contract; and, finally, even if the extrinsic evidence did not resolve the assumed ambiguity, the doctrine of contra proferentum (ambiguous contractual provisions are to be construed against the drafter) can be used as a tie-breaker to resolve any arguable contract ambiguity in favor of Zenith. From this ruling, too, EDS appeals.

## II. STANDARDS OF REVIEW

As to questions of law, which here include the district court's grant of partial summary judgment to Zenith on the good faith and fair dealing claim and the district court's conclusion that the Settlement Agreement is unambiguous and clearly obligates EDS to provide the software upgrades at issue, review is de novo . Scarborough v. Ridgeway, 726 F.2d 132, 135 (4th Cir. 1984).

As to factual conclusions reached by the district court, review is for clear error. Hendricks v. Central Reserve Life Ins. Co., 39 F.3d 507, 512 (4th Cir. 1994). Such factual conclusions here include the district court's alternative finding that, even if the Settlement Agreement were ambiguous as to EDS's obligations to provide software upgrades, extrinsic evidence supports Zenith's contention that EDS was required to supply such upgrades. The district court concluded that extrinsic evidence indicates that the parties' purpose in referencing portions of the Microsoft letter in paragraph four of the Settlement Agreement was only to insure that the price of a particular software package to EDS from its supplier, Microsoft, would apply to the Desktop IV contract's software. The district court found that the extrinsic evidence never reveals an intention by EDS or Zenith to limit EDS's obligations to provide free software upgrades under the Settlement Agreement to Zenith or to the Air Force directly.

This stricter clearly erroneous standard of review"plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573 (1985). Nor may a reviewing court reverse because, had it sat as trier of fact, "it would have weighed the evidence differently." Id. at 574; see also Amadeo v. Zant, 486 U.S. 214, 227 (1988). The clearly erroneous standard of review imposes a particularly heavy burden on an

4

appellant when the evidence before the district court was largely testimonial, because that court had the advantage of observing witnesses and evaluating their credibility firsthand, an opportunity a reviewing court lacks. See Hiram Walker & Sons, Inc. v. Kirk Line, 30 F.3d 1370 (11th Cir.) (internal citation omitted), cert. denied, 514 U.S. 1018 (1994). "Where there are two permissible views of evidence, the fact finder's choice between them cannot be clearly erroneous." Anderson, 470 U.S. at 574.

EDS argues that because the district court (Hilton, J.) largely adopted Zenith's proposed findings of fact, those findings consequently are entitled to less deference than ordinarily would be the case. EDS Brief at 12. Appellant's argument, however, is unpersuasive. "[E]ven when the trial judge adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous." Anderson, 470 U.S. at 572 (citing United States v. Marine Bancorporation, 418 U.S. 602, 615, n. 13 (1974); United States v. El Paso Natural Gas Co., 376 U.S. 651, 656-657 (1964)). This court, then, must adhere to the clearly erroneous standard in reviewing the district court's factual determinations, be they adopted or not.

III. BREACH OF SETTLEMENT AGREEMENT

A. The Settlement Agreement is Unambiguous: EDS is Obligated to Provide Free of Charge All Applications Software and Upgrades During the Life of the Desktop IV Contract to ZDS or the Air Force.

   1. The Settlement Agreement Incorporates Only Part of the Microsoft Letter and Only for the Limited Purpose of Setting the Software's Price.

Two provisions of the Settlement Agreement are implicated by the parties' current litigation.

a. Schedule B

The first provision, paragraph three, drafted by Zenith, references Zenith's obligations under "Schedule B" of the Desktop IV contract

5

and incorporates them into the Settlement Agreement as EDS's responsibilities thereunder. This provision states, in pertinent part, as follows:

> 3. . . . The products and terms to which ZDS has obligated itself for Desktop IV and to which EDS agrees are provided in Schedule B (3 pages) attached to, and made part of[,] this Agreement. . . .

Joint Appendix ("JA") at 493.

Continuing, Schedule B, in pertinent part, states as follows:

> [1] EDS will, at its sole cost and expense, supply all such application software . . . in full conformity with all requirements of the Desktop IV contract. . .;
>
> [2] EDS will assume all of the obligations of ZDS with respect to such application software to the same extent as if EDS were the contractor under the Desktop IV contract. . .;
>
> [3] EDS shall . . . perform and comply with all . . . software support requirements of the contract with respect to software and related documentation (including but not limited to . . . provision of modifications, improvements, updates and upgrades when and as required and bear the costs of delivery of such items to the Government. ..; and
>
> [4] [EDS shall] assume full responsibility for any default in such performance to the same extent as if it were the contractor under the contract.

JA at 499; see, Zenith Brief at 8.

b. Schedule C

The second Settlement Agreement provision implicated in this action is paragraph four, drafted by EDS, which states as follows:

6

4. The April 27, 1992 Terms and Conditions relating to Microsoft Office Automation Suite - Option 3 is incorporated herein as Schedule C and shall apply to this agreement between EDS and ZDS.

JA at 494.

Schedule C is the April 27, 1992 letter from Microsoft to EDS in which Microsoft first gave EDS certain price quotations for its various products. The letter contains three headings entitled, respectively, "Option 1"; "Option 2"; and "Option 3." JA at 500-01. Beneath each heading appears a schedule of prices, terms, and conditions applying specifically to each offered option. Id. The focus of the text appearing directly beneath each heading is the price of the various Microsoft software applications included in each option package, but the same text also includes, in the case of Option 3, certain royalty payment terms and conditions regarding the ordering of the software.[1] Id.

Several pages into the body of the letter after the option headings, the letter contains a paragraph entitled "Restrictions" which concerns Microsoft's obligation to supply EDS with software upgrades. Id. The paragraph states, in pertinent part, that:

_____

[1] The letter's heading "Office Automation Suite - Option 3" states, more fully, as follows: "The royalty pricing for this . . . product, consisting of the component products shown in the table below, is a per system/exclusive price, which means that it shall be licensed for all Basic, Intermediate, and Advanced Systems shipped with Office Automation software . . . under this contract effort. EDS shall only be responsible for the payment, to Microsoft, for the royalties equaling the product of the stated price . . . and 100% of the systems shipped . . . during the royalty reporting period. This does not include software shipped for all Separately Orderable Software . . . requirements. The component products may not be ordered separately, as they are only offered as a group of products to satisfy the Office Automation Software requirement for the subject effort. Exclusive in this Pricing Option means this price is contingent upon EDS bidding this Office Automation product as the sole and exclusive product in each and every proposal which EDS submits for this contract effort. [Then follow prices for Microsoft's Word for Windows, Excel for Windows, and PowerPoint for Windows software and for the Microsoft Mouse.]"

7

Upgrades may be used only by EDS to replace previously licensed versions of the Office Automation product, consisting of the individual application component products. . . distributed under this contract. . . . EDS shall not be entitled to receive Platform Upgrades (e.g. MS-DOS version to Windows version), or other products that are not direct successors to eligible Products (e.g. future products which may be know[n] as . . . Microsoft Windows 32, etc.) or any application products associated with the future products, under this Agreement.

EDS Brief at 18; JA at 503.

c. <u>Meanings of Schedule B and Schedule C</u>

Schedule B is clear that EDS must provide free of charge all software determined by the Air Force to qualify as an upgrade, just as Zenith would have had to do had it been fully responsible for the entire Desktop IV contract. EDS, then, "stands in the shoes" of Zenith with respect to the software component of the government contract, as Schedule B explicitly states, "as if EDS were the contractor under the Desktop IV contract." JA at 499. With respect to software upgrades, EDS must "bear the costs of delivery of such items to the Government . . . and . . . assume full responsibility for any default in such performance to the same extent as if it were the contractor under the contract." <u>Id</u>.

The "Restrictions" paragraph of the Microsoft letter states however, that Microsoft shall not provide similar software upgrades to EDS for future products such as "Microsoft Windows 32" (apparently, the nomenclative precursor to Microsoft Office 95). The later portion of the letter, were it incorporated into Schedule C of the Settlement Agreement as EDS, would prescribe that EDS's duties to supply software upgrades to the Air Force would be in perfect alignment with Microsoft's obligation, if any, to supply the same successor application products to EDS. In this case, EDS would have no obligation to supply, <u>gratis</u>, the Office 95 successor products because Microsoft had no such duty to do the same for EDS. This interpretation of the potential implication of the "Restrictions" paragraph is uncontested by the parties.

8

d. Reading Schedule B and Schedule C Together:
   Rules of Contract Interpretation

According to well-established contract rules, a contract should be interpreted as a whole, and all words (when possible) should be given their natural meaning. Paramount Termite Control Co. v. Rector, 380 S.E.2d 922, 925 (Va. 1989). Only if there appears to be a conflict between contract terms, should a court attempt to reconcile the apparent inconsistency. General obligations should not be interpreted to nullify specific terms. See, e.g., Sentinel Associates v. American Mfrs. Mut. Ins. Co., 804 F.Supp. 815 (E.D.Va.), aff'd, 30 F.3d 130 (4th Cir. 1992). Nevertheless, a collateral writing incorporated into an arguably more general contract should be construed as part of the contract only for "the purpose and extent indicated." W.D. Nelson and Co., Inc. v. Taylor Heights Dev. Corp., 150 S.E.2d 142, 146 (Va. 1966). Finally, extrinsic evidence as to intent should be considered only if the contractual language is ambiguous. See, e.g., Great Falls Hardware Co. v. South Lakes Village Ctr. Assocs., Ltd. Partnership, 380 S.E.2d 642, 643 (Va. 1989).

e. The District Court's Interpretation

The district court found that the language in paragraph four, which incorporates "Terms and Conditions relating to Microsoft Office Automation Suite - Option 3" unambiguously incorporates only the portion of the Microsoft letter immediately following the heading "Office Automation Suite - Option 3" which relates, primarily, to pricing information. JA at 110-11. The district court concluded that "[t]he Settlement Agreement does not incorporate the entire Microsoft Letter, the restrictions paragraph or any other provision limiting EDS's obligations to provide Office 95 upgrades free of charge. . . ." JA at 111.

The district court undertook a careful, explicit, and correct analysis of the Settlement Agreement's wording and organization. In determining that paragraphs three and four are unambiguously reconcilable, the district court properly applied the rule that in determining the plain meaning of a contract, collateral writings incorporated by reference are to be construed as part of the contract only for "the purpose and extent indicated." W.D. Nelson, 150 S.E.2d at 146.

9

The district court began its analysis of the Settlement Agreement by concluding that paragraph three clearly provides that Schedule B governs the overall business relationship between ZDS and EDS under the Desktop IV contract. Findings of Fact and Conclusions of Law at 11; JA at 111. Indeed, in Schedule B, EDS obligates itself to a broad range of responsibilities to the Air Force and to ZDS, without qualification, whereby EDS "will, at its sole cost and expense, supply all such application software . . . in full conformity with all the requirements of the Desktop IV contract." JA at 499. Schedule B continues in its clarity: "EDS will assume all of the obligations of ZDS with respect to such application software to the same extent as if EDS were the contractor under the Desktop IV contract. .. ." Id. Finally, EDS specifically agrees to "comply with all . . . software support requirements of the [Desktop IV] contract with respect to software and related documentation (including, but not limited to . . . provision of modifications, improvements, updates and upgrades when and as required and bear the costs of delivery of such items to the Government). . . ." Id.

The district court next concluded that paragraph four of the Settlement Agreement incorporates into Schedule C only the price-focused "Microsoft Office Automation Suite - Option 3" information from the Microsoft letter when that paragraph explicitly refers only to the "[t]erms and [c]onditions" which immediately follow that option's heading. Findings of Fact and Conclusions of Law at 11; JA at 111.

The district court concluded that paragraph four's incorporative reach is confined to the those terms and conditions explicitly mentioned--those under the heading "Microsoft Office Automation Suite - Option 3." The district court found that, by clear omission, the paragraph does not incorporate the entire letter, the "Restrictions" paragraph, or other arguable terms and conditions located elsewhere in the letter. Id.

That EDS, whose representative drafted paragraph four of the Settlement Agreement, there referred specifically to the terms and conditions of "Office Automation Suite - Option 3" (terminology identical to that in the heading of the Microsoft letter itself) and omitted altogether any mention of the "Restrictions" paragraph later in the letter, leads directly to the conclusions of the district court. Paragraph four

10

incorporates only the pricing information of Option 3 for the limited purpose of establishing the price of the software EDS would have to resupply the Air Force pursuant to Schedule B. Any other interpretation would deprive paragraph three of the Settlement Agreement of its overall governing authority over the ZDS/EDS business relationship. The interpretation of the Settlement Agreement urged by EDS[2] would yield the anomalous result that EDS stands in the shoes of Zenith "as if EDS were the contractor under the Desktop IV contract" in <u>form</u> (by virtue of Schedule B in paragraph three) but not in <u>fact</u> (by virtue of the letter's Restrictions paragraph) with respect to supplying software upgrades to the Air Force.

The Settlement Agreement as a whole, however, is unambiguous and thus avoids this potentially curious scenario. Thus, we hold that the contract, taken as a whole, is unambiguous and obligates EDS to provide such free software upgrades and updates in both form and in fact. While this holding resolves the issue of the interpretation of the Settlement Agreement itself, we go on, perhaps in an exercise of supererogation, to address, as the district court did, the issue of the interpretation of the Agreement's extrinsic evidence.

_____

**2** EDS argues that "[p]roperly construed, [p]aragraph 4 must be read to define and limit, but not supplant, the obligations of [p]aragraph 3 and Schedule B. . . ." EDS Brief at 19. In fact, however, EDS's urged construction of the Settlement Agreement would result in the incorporated "Restrictions" paragraph supplanting (and rendering a nullity) paragraph three and Schedule B. This court rejects such an interpretation of the Settlement Agreement because we conclude, as the district court did, that paragraph three and Schedule B control the overall business relationship between EDS and Zenith under the Settlement Agreement. To deny paragraph three and Schedule B their governing force, as well, would do violence to the well-established rule of contract interpretation that all words in a contract should be given their natural meaning so as to honor the parties' intent. <u>See Paramount Termite Control Co.</u>, 380 S.E.2d at 925 (Va. 1989).

11

B. The District Court's Determination That, Alternatively,
     Extrinsic Evidence Indicates that EDS is Obligated to Provide
     Software Updates is Not Clearly Erroneous.

Assuming that paragraph four does incorporate the"Restrictions"
paragraph of the Microsoft letter, as the district court did for purposes
of analysis, Schedule C would conflict with Schedule B of the Settle-
ment Agreement. By this interpretation, Schedule B would indicate
that EDS shall "stand in the shoes" of Zenith as to provision of all
software upgrades under the Desktop IV contract, while Schedule C's
incorporation of the letter's "Restrictions" paragraph, would except
certain software, including the Office 95 software at issue, from
EDS's supply obligations under the contract. This internal ambiguity
as between the schedules then would have to be reconciled by consid-
ering parol or extrinsic evidence. See, e.g., Federal Ins. Co. v. Starr
Elec. Co., 410 S.E.2d 684 (Va. 1991); Anden Group v. Leesburg Joint
Venture, 377 S.E.2d 452, 455 (Va. 1989).

Such an ambiguity was implicitly assumed, again only for the sake
of inquiry, by the district court when it undertook an analysis of the
extrinsic evidence to resolve the asserted ambiguity. As to the
assumed ambiguity between the schedules, EDS argues that its pur-
pose in including paragraph four/Schedule C was to limit its obliga-
tion to supply free software upgrades to the Air Force so as to exclude
the 32-bit programs (including Office 95) mentioned in the Microsoft
letter's "Restrictions" paragraph. Zenith maintains that in incorporat-
ing the letter, EDS, the drafter of paragraph four, was concerned only
with continuing the Option 3 pricing it had obtained from Microsoft
and not with limiting its software supply liability under the "Restric-
tions" paragraph. The district court concluded that if the contract were
deemed facially ambiguous as to EDS's duty to supply free software
upgrades, extrinsic evidence clearly reveals that EDS intended to
remain obligated to provide such software under its carved out portion
of the Desktop IV contract. EDS had no intention to limit its liability
for the Microsoft software now at issue. Rather, EDS wished only to
continue with Option 3 pricing from Microsoft, its supplier, for a vari-
ety of products.

The district court's interpretation of the extrinsic evidence to deter-
mine the meaning of the Settlement Agreement is not clearly errone-

12

ous. Rather, the court undertook a careful analysis during the bench trial of the contracting parties' testimony so as to ascertain their ex ante interpretation of their rights and responsibilities under the Settlement Agreement. Such an understanding of a contract by the parties themselves "before a dispute has arisen, is entitled to the greatest weight." Treakle v. Pocahontas Steamship Co. , 273 F.Supp. 608, 611 (E.D. Va. 1967), aff'd, 406 F.2d 412 (4th Cir. 1969). The district court analyzed the extrinsic evidence and, necessarily, made conclusions as to testifying witnesses' credibility which this court shall not disturb. See Hiram Walker & Sons, Inc., 30 F.3d 1370; Anderson, 470 U.S. at 574.

1. The Extrinsic Evidence

A summary of the pertinent testimony about the parties' intentions and understandings concerning the Settlement Agreement is as follows:

First, Paul Rector, Program Manager of EDS and Business Manager for EDS's Desktop IV proposal, testified at the bench trial that he pointed out the restrictions paragraph to Dr. Lipkin (Zenith's chief negotiator) and that one of the reasons EDS incorporated Schedule C was to limit EDS's liability for 32-bit applications. JA at 168. Importantly, however, Mr. Rector also admitted that price was crucial to EDS. JA at 189. Unless EDS were able to secure Option 3 pricing from Microsoft, it would not be able to close the deal with Zenith. JA at 179, 192.

As well, Mr. Luke, an EDS vice-president and its prime negotiator on the Settlement Agreement, testified that the breadth of Schedule B disturbed him, and he decided that Schedule C should be incorporated, in part, to limit EDS's liability for upgrades that Microsoft was not bound to provide EDS. JA at 244, 246. Mr. Luke admitted, however, that Option 3 pricing was a major concern for EDS; it needed to ensure Microsoft would honor the price quotes relating to Option 3 and that was one of the reasons EDS incorporated portions of Schedule C into the Settlement Agreement. JA at 252. As well, both Rector and Luke testified that there exists no EDS document that confirms that at the time of the negotiations EDS was concerned about limiting its software upgrade liability. JA at 213-14; 258-59.

13

Third, Mr. Dale Wince, a former technical director for the Desktop IV solicitation for EDS, testified he never heard anyone discuss limiting liability for the 32-bit applications during the drafting of the Settlement Agreement. JA at 343. He testified that the reason for the incorporation of Schedule C was to lock in Option 3 pricing for EDS from Microsoft. JA at 343.

Dr. Lipkin, Zenith's primary negotiator, stated that some of the terms and conditions not immediately under the Option 3 heading of the Microsoft letter apply to the Option 3 software package. JA at 310-11. Apparently, he understood this, because Schedule C was a document he was familiar with prior to its incorporation into the parties' contract. Microsoft had sent Zenith its own letter identical to Schedule C. JA at 906-12. Dr. Lipkin apparently indicated that Zenith desired Option 3 pricing itself and Microsoft's offer was redrafted by Zenith to exclude the other options. Zenith left untouched the "Restrictions" paragraph in the reworked letter Dr. Lipkin returned to Microsoft. JA 309-11.

However, Dr. Lipkin also testified that no one from EDS ever discussed the "Restrictions" paragraph with him or pointed it out to him. JA at 296. He denied that Mr. Luke ever expressed any concerns about Schedule B or about limiting liability for 32-bit software applications. JA 339-40. He testified that EDS told him that its purpose in incorporating Schedule C was to ensure that Option 3 pricing from Microsoft was made part of the deal. JA at 296-97. Finally, Dr. Lipkin testified that had he believed that EDS wished to limit its liability for the 32-bit applications, he would have advised his supervisor at ZDS not to sign the Settlement Agreement. JA at 297-98.

Thomas Buchsbaum, Dr. Lipkin's supervisor who signed the agreement on behalf of Zenith, testified that his understanding of paragraph four was that its purpose was only to incorporate Option 3 pricing. JA at 356-57. Mr. Buchsbaum was familiar with Schedule C and the "Restrictions" paragraph and believed the latter did not apply to the agreement between Zenith and EDS. JA at 361.

Finally, Mr. Fulton Hayes, a contract manager for EDS who signed the agreement on behalf of EDS, testified that he was not thinking about 32-bit applications liability at the time he signed the Settlement

14

Agreement and that no one from EDS expressed such a concern. JA at 393-95. As well, Mr. Hayes wrote a memorandum on June 1, 1993 which recalls that during the negotiations leading to the Settlement Agreement, Schedule C was appended to the document because EDS wished to secure Option 3 pricing from Microsoft and not to limit its liability for 32-bit software applications.**3** JA at 397; 839.

2. Analysis of the Extrinsic Evidence

The district court made no express determinations as to credibility. It must be assumed, however, that the district court weighed credibility so as to determine which witnesses to believe and that such assessments are implicit in the court's findings of fact. We begin our analysis of the extrinsic evidence by noting again that a reviewing court may not reverse because, had it sat as trier of fact, "it would have weighed the evidence differently." Andersen, 470 U.S. at 574. As well, we are admonished that "[w]here there are two permissible views of evidence, the fact finder's choice between them cannot be clearly erroneous." Id.

The testimony is clear that Zenith had been assured by Microsoft that neither Microsoft nor the Air Force would consider Office 95 an upgrade; Microsoft had assured Zenith that Schedule C was consistent with the government's expectations. This fact perhaps explains why Zenith might have been unconcerned with the "Restrictions" para-

_____

**3** The relevant text of the June 1, 1993 memorandum reads: "During discussions between Mr. Luke and Mr. Burden . . . the two parties agreed that Microsoft would honor the DT IV quote to EDS with EDS acting as a subcontractor to ZDS. . . . After reaching this agreement, Mr. Luke was concerned that there might be something in the ZDS/Microsoft quote that was sufficiently different from the EDS/Microsoft quote and that this difference might have some impact on EDS' ability to deliver Microsoft products to ADS at the prices agreed upon between EDS and Microsoft. My recollection is that Mr. Luke expressed this concern to Mr. Burden and was told that `. . . EDS and ZDS received the same deal from Microsoft.' Acting upon the belief, based upon Mr. Burden's statement, that the quotes to both companies had been identical, we included the Micosoft [sic] quote to EDS as a part of the EDS/ZDS SETTLEMENT AGREEMENT so that all terms and conditions affecting the Microsoft products would be clearly specified. . . ."

15

graph even arguably being incorporated into the Settlement Agreement as a "term" or "condition" of Option 3.

The record is replete with testimony, much of it from EDS's chief negotiators on the Settlement Agreement, that EDS was very concerned about receiving Option 3 pricing from Microsoft. Permeating the negotiations was EDS's realization that a higher price for the software may well have precluded final resolution of the Desktop IV contract bid dispute. On the other hand, even the EDS executives who did not specifically have concerns about 32-bit applications were very concerned that EDS's obligations to Zenith be aligned with Microsoft's obligations to EDS.

The crux of the dispute as to the parties' understanding is whether the "Restrictions" paragraph was or was not mentioned during negotiations. This court can only conclude that the district court, as trier of fact, placed greater weight on the testimony of Zenith's witnesses on this point based on those witnesses' superior credibility. Because the clearly erroneous standard applies to this issue, even if this court were inclined toward such a view, that standard of review "plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." Anderson, 470 U.S. 564, 573.

We hold, therefore, that because there is ample evidence in the record to support the district court's findings, and because such findings based, as they are, on plausible credibility determinations cannot constitute clear error, the district court's findings of fact as to the extrinsic evidence shall not be disturbed. Assuming, again for purposes of analysis, that the Settlement Agreement were ambiguous as to EDS's software upgrade liability, ample extrinsic evidence exists supporting Zenith's contention that Schedule B was intended to impose such an obligation on EDS while Schedule C was incorporated into the Settlement Agreement by EDS only to secure continued favorable pricing for software from its supplier. The district court committed no clear error when it so found.**4**

_____

**4** Because we hold, first, that the Settlement Agreement is unambiguous and, second, that were it ambiguous, extrinsic evidence supports Zenith's

16

IV. BREACH OF GOOD FAITH AND FAIR DEALING

Zenith and EDS modified the Settlement Agreement on April 22, 1993 to include the following paragraphs:

> 5. ZDS agrees to make a good faith effort to obtain Air Force acceptance of Desktop IV documentation provided by EDS in its BAFO submission.
>
> 6. EDS agrees to make a good faith effort to obtain Army acceptance of ZDS' 80486 Z-248 upgrade board on EDS' SMC contract. When EDS submits the ECP [Engineering Change Proposal] for this ZDS product, ZDS agrees to change the year one price for CLIN 0005AA in SCHED-ULE A of this AGREEMENT from $250.00 to $255.00.

JA at 819.

Thereafter, EDS asked Zenith to propose certain modifications in the Desktop IV contract to the Air Force, to wit : (1) a suggestion that the Air Force accept 5.25 inch computer disks instead of 3.5 inch disks; and (2) a suggestion that the Air Force accept software documentation printed in black and white instead of in color. JA at 152-60. Zenith apparently did propose the relevant modifications, but in an informal way, without submitting a written proposal to the government. EDS contends that Zenith thereby breached its duty of good faith and fair dealing or, at least, that the district court should not have granted summary judgment against it because there exists a genuine issue of material fact as to whether Zenith's conduct was commercially reasonable.

_____

interpretation of paragraph four and Schedule C, we need not decide the case by applying the doctrine of contra proferentum (an ambiguous contract or contract provision is to be construed against its drafter). See, e.g., Mahoney v. NationsBank of Virginia, 455 S.E.2d 5 (Va. 1995). The district court found, however, that EDS drafted paragraph four and, thus, would have that contract provision construed against it, were it deemed ambiguous. The district court committed no error in applying the well-established rule of contra proferentum to this finding of fact.

17

A. Standard of Review of Grant of Summary Judgment

A district court's grant of summary judgment, as a question of law, is reviewed de novo. See, e.g., Sempione v. Provident Bank of Maryland, 75 F.3d 951, 954 (4th Cir. 1996). A summary judgment movant must demonstrate that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett , 477 U.S. 317, 323 (1986); Anderson v. Liberty Lobby, 477 U.S. 242, 250 (1986).

In considering a motion for summary judgment, a district court should view the evidence in light of the pleadings, drawing all facts and inferences in favor of the non-moving party. Anderson, 477 U.S. at 255 (citing Adickes v. Kress, 398 U.S. 144, 158-59 (1970)); Charbonnages de France v. Smith, 597 F.2d 406 (4th Cir. 1979).

The non-moving party is entitled to have the credibility of all its evidence presumed. Miller v. Leathers, 913 F.2d 1085, 1087 (4th Cir. 1990), cert. denied, 498 U.S. 1109 (1991). Before the non-moving party must face the burden of demonstrating the existence of a triable issue of fact, the movant must meet its burden of showing the absence of evidence to support the non-movant's case. Celotex, 477 U.S. at 325; see also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390, 393-94 (4th Cir. 1994).

There must be more than a scintilla of evidence to support the non-movant's case. Anderson, 477 U.S. at 247. Rather, the evidence must be sufficient to "return a verdict" at trial for the party opposing the entry of judgment. Id. at 249. The non-moving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985). Moreover, the existence only of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion. See Thompson Everett, Inc. v. National Cable Adv., 57 F.3d 1317, 1323 (4th Cir. 1995) ("[I]f the evidence is `merely colorable' or `not significantly probative,' it may not be adequate to oppose entry of summary judgment.").

18

B. <u>Computer Disks</u>

Although Zenith clearly bound itself contractually to suggest black and white documentation (it agreed to make a "good faith" effort to obtain Air Force acceptance of this proposal, <u>see</u> JA at 580), the understanding as to disk size appears to be little more than a gratuitous promise made by Dr. Lipkin to EDS, supported by no consideration. <u>See, e.g.</u>, JA at 661-63 (Dr. Lipkin told EDS that he "would present [the EDS disk proposal] to the Air Force and get a reaction to it."). As well, EDS later attempted in 1994 to negotiate a firm commitment from Zenith to the effect that Zenith would gain approval by the Air Force of computer disks of EDS's proposed size. JA at 577; 679-81; 713-14. This court can only conclude from the stated need for further, more concrete negotiations that EDS did not interpret Dr. Lipkin's earlier promise as anything more than a gratuitous promise lacking in consideration and, thus, unenforceable under the well-established rules of contract formation.[5]

Hence, as to the computer disks, we hold that Zenith had no contractual obligation to suggest Desktop IV modifications to the Air Force at all, much less to suggest them by submission of a formal, written proposal. Because no contract existed, EDS's breach of good faith and fair dealing claim as to the disks fails as a matter of law.

C. <u>Black and White Documentation</u>

As to black and white documentation, Zenith presented no formal proposal, but did submit three separate documentation samples and essentially asked the Air Force to choose the one it preferred. According to Dr. Lipkin, ZDS did this "as informally as possible." JA at 658. Zenith, in presenting the proposal to the Air Force, passed it on to the "test director" rather than the branch's contracting officer. JA at 658.

EDS urges that the grant of summary judgment on this claim was precipitous. EDS argues that whether Zenith's proposal to the Air

_____
[5] Consideration, of course, is an essential element of a binding contract whether in the form of a benefit paid to the promisor or a detriment incurred by the promisee. <u>See, e.g., Coulter v. Gillio</u>, 184 S.E. 201 (Va. 1936); <u>Sager v. Basham</u>, 401 S.E.2d 676 (Va. 1991).

19

Force was made in good faith and was commercially reasonable under Va. Code § 8.1-203 is a question of fact that ought not be resolved on a motion for summary judgment, given Dr. Lipkin's concessions that Zenith made the proposal to the Air Force "as informally as possible" and failed to address the proposal to the highest contracting official. EDS maintains that whether a merchant has acted in a commercially reasonable manner consistent with its good faith obligations is a matter of fact requiring evidence of trade custom and industry standards.[6]

The district court, however, determined that Zenith proposed the black and white documentation to the government in good faith and did so not by looking to the commercial standards of the contracting industry, but rather by examining Zenith's own conduct. See, RW Power Partners, L.P. v. Virginia Elec. and Power Co. , 899 F.Supp. 1490, 1498 (E.D.Va. 1995) (holding in declaratory judgment action that utility company, by its own behavior, did not act in bad faith so as to breach implied duties of good faith and fair dealing under Va. Code §§ 8.1-203 and 8.1-103). Such an examination here reveals that the documentation which the Air Force ultimately accepted for shipping on the Desktop IV contract, while not EDS's black and white documentation which the Air Force had rejected, was based on the documentation samples submitted by Zenith, in good faith pursuant to the Settlement Agreement.

Therefore, as to the good faith and fair dealing count (COUNT II) of the counterclaim relating to both the computer disks and the black and white documentation, we affirm the district court's grant of summary judgment to Zenith. EDS presents no genuine issue of material fact as to whether Zenith met the good faith obligations it had under the Settlement Agreement.

---

[6] EDS's Brief at 37-38 cites a number of cases from other jurisdictions which, necessarily, did not have occasion to interpret Va. Code § 8.1-203. Specifically, EDS cites authority in support of its argument from the Sixth, Ninth and D.C. Circuits. In the case of Nanakuli Paving and Rock Co. v. Shell Oil Co., Inc., 664 F.2d 772, 779 (9th Cir. 1981), however, the court held only that the district court did not abuse its discretion in looking to the applicable trade to ascertain trade usages defining good faith and fair dealing rather than looking to the purchase and sale at issue alone.

20

V. <u>CONCLUSION</u>

For the reasons stated herein, this court hereby affirms the judgment of the district court in its entirety as to both the breach of contract claim and the breach of good faith and fair dealing counterclaim. It is so ordered.

<u>AFFIRMED</u>

21